IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

MURPHY OIL CORPORATION                                PLAINTIFF

V.                             CASE NO. 1:18-CV-1013

LIBERTY MUTUAL FIRE INSURANCE COMPANY            DEFENDANT

## MEMORANDUM OPINION AND ORDER

Currently before the Court are cross-motions for summary judgment filed by Plaintiff Murphy Oil Corporation ("Murphy") and Defendant Liberty Mutual Fire Insurance Company ("Liberty").[1] For the reasons given below, Murphy's motion is **DENIED**, Liberty's motion is **GRANTED**, and Murphy's Complaint is **DISMISSED WITH PREJUDICE**.

### I. BACKGROUND

In September 2011, Valero Energy Corporation ("Valero") purchased an oil refinery ("the Refinery") in Meraux, Louisiana from Murphy, pursuant to an Asset Purchase Agreement ("APA"). *See* Doc. 30-2. The following year, on July 22, 2012, a fire occurred at the Refinery's Crude Unit, causing extensive structural damage. After investigating the matter, Valero concluded that the fire was caused by various acts and omissions that

---

[1] The documents considered by the Court include: Murphy's Motion for Partial Summary Judgment (Doc. 28), Brief in Support (Doc. 29), and Statement of Material Facts (Doc. 30); Liberty's Cross-Motion for Summary Judgment (Doc. 35), Memorandum of Law in opposition to Murphy's Motion and in support of Liberty's Cross-Motion (Doc. 37), and Combined Response to Murphy's Statement of Material Facts and Statement of Undisputed Material Facts (Doc. 36); Murphy's Reply Brief in support of Murphy's Motion and in opposition to Liberty's Cross-Motion (Doc. 40), and Response to Liberty's Statement of Undisputed Material Facts (Doc. 41); Liberty's Reply Brief in support of its Cross-Motion (Doc. 42); and Murphy's Surreply (Doc. 45).

Murphy had committed prior to the APA's closing. In November of that same year, the Environmental Protection Agency ("EPA"), informed Valero that it would seek to impose penalties on Valero for violations of the Clean Air Act based on the July fire.

In December 2012, Valero sent Murphy a letter demanding that Murphy indemnify Valero for the full amount of damages it had sustained (and would sustain in the future) in connection with the July fire, including any EPA penalties related to that fire. See Doc. 30-4, p. 4. In that same letter, Valero described various additional violations of environmental law that its investigation had uncovered, accusing Murphy of having made material misrepresentations or omissions about those violations to Valero during the sale of the Refinery, and demanding that Murphy indemnify it for the various damages and penalties that it had suffered (or expected to suffer) as a result. See id. at 4–7. The letter's demands were explicitly premised on the APA's indemnity provision, see id. at 1, 3, which states in relevant part that Murphy will indemnify Valero for "any and all damage, loss and expense . . . actually suffered by [Valero] to the extent arising out of: (i) any misrepresentation or breach of warranty; . . . or (iii) any Retained Liability," see Doc. 30-2, p. 85, § 13.02(a); see also id. at p. 30, § 2.04(f) (defining "Retained Liabilities" to include "the Retained Environmental Liabilities," which are defined in § 1.01(a) to include a wide variety of "liabilities and obligations arising under Environmental Law to the extent arising from the ownership or operation of [the Refinery] prior to Closing . . . ."). Valero's letter concluded by informing Murphy that it expected its total indemnification claims to exceed $52,000,000, demanding a response within ten business days, and threatening to file a lawsuit before the end of 2012 unless an agreement to toll the statute of limitations could be reached before then. See Doc. 30-4, p. 7.

Murphy promptly notified its insurer, Liberty, of Valero's claims against it, and asked Liberty to provide Murphy a defense under the commercial general liability ("CGL") policy that Murphy had purchased from it ("the Policy"). Liberty declined to do so, contending that it had no duty under the Policy to defend Murphy against Valero's claims. *See* Doc. 30-7, pp. 1, 30–33. At a general level, Liberty's justifications were twofold. First, no lawsuit had actually been filed yet. Second, and regardless of the first, the policy did not provide coverage for this type of claim. Murphy disagreed with both justifications, and continued apprising Liberty of developments in its negotiations with Valero over the next several years, as the two oil companies attempted to resolve their dispute outside of court. *See, e.g.*, Docs. 30-9, 30-10, 30-11.

Ultimately, Murphy and Valero were unable to resolve their dispute, and on February 7, 2017, Valero filed a one-count complaint against Murphy for breach of contract in New York state court ("the New York Lawsuit"), claiming damages in excess of $25,000,000. *See* Doc. 30-3. Murphy again requested a defense from Liberty. *See* Doc. 30-8. In November 2017, Liberty again refused, denying that it had any duty to provide one. So the following year, Murphy filed the instant lawsuit against Liberty in this Court, seeking a declaratory judgment and damages for breach of contract. *See* Doc. 1. Among other things, Murphy's Complaint asks this Court to declare that the Policy requires Liberty to provide Murphy a defense against Valero. *See id.* The Complaint also asks this Court to order Liberty to pay for that defense and to reimburse Murphy for the defense costs that Murphy has already incurred. *See id.*

Murphy and Liberty have filed cross-motions for summary judgment against each other. Those motions have been extensively briefed, *see* Note 1, *supra*, and on

3

December 18, 2018, this Court received oral argument on them. Both motions are now ripe for decision.

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When, as here, cross-motions for summary judgment are filed, each motion should be reviewed in its own right, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983). The Court must view the facts in the light most favorable to the non-moving party, and give the non-moving party the benefit of any logical inferences that can be drawn from the facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of any material factual disputes. Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

If the moving party meets this burden, then the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting then-Fed. R. Civ. P. 56(e)) (emphasis removed). These facts must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific

facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986)).

## III. DISCUSSION

Murphy's summary judgment motion asks this Court to enter judgment in Murphy's favor by declaring that: (1) Liberty owes Murphy a duty to defend it against Valero's claims in the New York Lawsuit; (2) Liberty's duty encompasses attorney fees incurred by Murphy before the New York Lawsuit was filed; and (3) Liberty's duty to defend is not subject to the deductible or policy limits of the Policy. *See* Doc. 28, p. 1. Of course, Liberty opposes that request, and in its own motion asks this Court to declare that: (1) Liberty has no duty to defend Murphy against Valero's claims in the New York Lawsuit; (2) Liberty is not obligated to pay for the costs and fees Murphy incurred through the negotiations with Valero that preceded the New York Lawsuit's filing; and (3) in any event, Liberty is not liable for any defense costs under the Policy until Murphy meets its deductible obligations. *See* Doc. 35, p. 1.

Under the doctrine of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity jurisdiction must "apply the substantive law of the forum State, absent a federal statutory or constitutional directive to the contrary." *Salve Regina Coll. v. Russell*, 499 U.S. 225, 226 (1991). The parties, and this Court, all agree that Arkansas law governs the interpretation of the Policy.[2] Thus, this Court must apply governing

---

[2] The Policy does not specify which state's law governs its interpretation. But the state of Arkansas has the "most significant relationship" with the Policy, *see Fuller v. Hartford Life Ins. Co.*, 281 F.3d 704, 707 (8th Cir. 2002); *Scottsdale Ins. Co. v. Morrowland Valley Co., LLC*, 2012 Ark. 247, at *7, 411 S.W.3d 184, as the Policy was issued in Arkansas

5

precedent from the Arkansas Supreme Court; and if there is no such case that is directly on point, then this Court must predict how the Arkansas Supreme Court would rule if faced with the same issues that are presently before this Court. *See Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 856 (8th Cir. 2010).

Under Arkansas law, "[a]n insurance policy is to be construed strictly against the insurer, who chooses its language," *Southall v. Farm Bureau Mut. Ins. Co. of Ark.*, 276 Ark. 58, 60, 632 S.W.2d 420 (1982), "and if a reasonable construction may be given to the contract which would justify recovery, it would be the duty of the court to do so," *Smith v. Prudential Prop. and Cas. Ins. Co.*, 340 Ark. 335, 340, 10 S.W.3d 846 (2000). Put differently, "if the language employed is ambiguous, or there is doubt or uncertainty as to its meaning and it is fairly susceptible of two interpretations, one favorable to the insured and the other favorable to the insurer, the former will be adopted." *Id.* at 341. However, contractual provisions must nevertheless "be interpreted by the court in the plain and ordinary meaning of the terms and cannot be construed to contain a different meaning." *Horn v. Imperial Cas. & Indem. Co.*, 5 Ark. App. 277, 278–79, 636 S.W.2d 302 (1982). "The terms of an insurance contract are not to be rewritten under the rule of strict construction against the company issuing it so as to bind the insurer to a risk which is plainly excluded and for which it was not paid." *S. Farm Bureau Cas. Ins. Co. v. Williams*, 260 Ark. 659, 664, 543 S.W.2d 467 (1976). In summary, then: "An insurance contract is to be construed strictly against the insurer; but where the language is unambiguous, and only one reasonable interpretation is possible, it is the duty of the courts to give effect to

---

and contains a variety of Arkansas-specific endorsements, and as Murphy's principal place of business is in Arkansas. *See* Doc. 30-5, pp. 3, 16–19; Doc. 1, ¶ 6.

the plain wording of the policy." *Ingram v. Life Ins. Co. of Ga.*, 234 Ark. 771, 773, 354 S.W.2d 549 (1962).

Importantly, the question of whether an insurance policy imposes a duty to defend on an insurer is a "separate and distinct" question from whether the insurer has a "duty to indemnify its insured for liability that is imposed after trial." *See S. Farm Bureau Cas. Ins. Co. v. Watkins*, 2011 Ark. App. 388, at *7, 386 S.W. 3d 6 (quoting 14 COUCH ON INSURANCE § 200.3 (3d ed. 2011)). However, those two issues are nevertheless related. "The duty to defend is broader than the duty to indemnify; the duty to defend arises when there is a *possibility* that the injury or damage [may] fall within the policy coverage." *Kolbeck v. Truck Ins. Exch.*, 2014 Ark. 108, at *6, 431 S.W.3d 900 (emphasis added). Naturally, then, the corollary is that "[w]here there is no possibility that the damage alleged in the complaint may fall within the policy coverage, there is no duty to defend." *Id.*

With these preliminaries out of the way, it is time to look at the pertinent provisions of the Policy in this case. The Policy states that Liberty "will pay those sums that [Murphy] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies," and that Liberty "will have the right and duty to defend [Murphy] against any 'suit' seeking those damages." *See* Doc. 30-5, p. 21, § I.1(a). It further explains that the Policy only applies to "bodily injury" or "property damage" that: "(1) . . . is caused by an 'occurrence' that takes place in the 'coverage territory'; (2) . . . occurs during the policy period;" and (3) was unknown to Murphy before the policy period. *See id.* at § I.1(b). The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *See id.* at 34, § V.13. Elsewhere, under "Exclusions," the Policy states that

7

"[t]his insurance does not apply to . . . '[b]odily injury' or 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." *See id.* at 22, § I.2(b). However, there is also an exception to this exclusion, stating that "[t]his exclusion does not apply to liability for damages: (1) [t]hat the insured would have in the absence of the contract or agreement; or (2) [a]ssumed in a contract or agreement that is an 'insured contract', provided the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract or agreement." *See id.* Murphy contends that although technically Valero's claim against it is a claim for breach of contract, in substance it is really just a tort liability that Murphy would have in the absence of the APA's limitation-of-liability clause (which requires Valero to bring any and all of its Refinery claims against Murphy as contract actions, *see* Doc. 30-2, pp. 89–90, § 13.08). Therefore, Murphy argues, there is a possibility of coverage under the Policy's "absence of the contract" exception, and Liberty accordingly has a duty to defend Murphy.[3]

Both parties have identified three Arkansas Supreme Court cases that govern the core issues here: *Unigard Sec. Ins. Co. v. Murphy Oil USA, Inc.*, 331 Ark. 211, 962 S.W.2d 735 (1998); *U.S. Fid. & Guar. Co. v. Cont'l Cas. Co.*, 353 Ark. 834, 120 S.W.3d 556 (2003) ("*Fidelity*"); and *Columbia Ins. Grp., Inc. v. Cenark Project Mgmt. Servs., Inc.*, 2016 Ark. 185, 491 S.W.3d 135. However, the parties have radically differing interpretations of those cases.

---

[3] Murphy concedes that the APA is not an "insured contract" under the Policy, and does not argue that the "insured contract" exception applies here.

8

In each of those cases, the Arkansas Supreme Court made a ruling about whether a CGL insurance policy provided coverage to an insured. And all three cases dealt with insurance policies containing language about "bodily injury" or "property damage" that was essentially identical to the language quoted above in the instant Policy. *Unigard* and *Columbia* both held there was no coverage under their particular facts. *See Columbia*, 2016 Ark. 185, at *2; *Unigard*, 331 Ark. at 227. *Fidelity*, unlike the other two cases, held that coverage might exist, and remanded for further factfinding on whether the underlying liability was assumed in an "insured contract," as the policy in that case contained an "insured contract" exception to a more general contractual-liability exclusion that was essentially identical to the language quoted above in the instant Policy. *See Fidelity*, 353 Ark. at 843. Predictably, Liberty feels the instant facts are most strongly analogous to those in *Unigard* and *Columbia*, while Murphy feels they are much more closely analogous to those in *Fidelity*.

But above and beyond any factual similarities or differences, Liberty cites *Columbia* for the broad proposition that this Court should not even consider any exclusions or exceptions in the Policy because "a CGL policy does not extend basic coverage for a claim of breach of contract," period. *Columbia*, 2016 Ark. 185, at *2. And indeed, that is what *Columbia* says, several times. *See id.* at *10 ("This court is not alone in recognizing that breach-of-contract claims are not covered by CGL policies."). The *Columbia* court characterizes its holding as nothing more than simple adherence to its precedent in *Unigard*. *See id.* at *7–*11. This is unfortunate all around, as this Court strongly agrees with Justice Danielson, who wrote in dissent that:

> the majority overstates our holding in [*Unigard*]. Contrary to the majority's assertion, *Unigard* does not stand for the proposition that a CGL policy can

9

never extend coverage for a claim of breach of contract. Such a proposition would be untenable given the fact that the CGL policy at issue in that case, like the one at issue here, did not define coverage with reference to any specific cause of action.

*Id.* at *16. But far more importantly, while reasonable minds could perhaps disagree on how accurately *Columbia* characterizes the holding and reasoning of *Unigard* (which will be discussed in greater detail below), there is simply no serious denying that *Columbia* completely disregards what happened in *Fidelity*, where, again, the Arkansas Supreme Court explicitly held that the particular CGL policy at issue in that case *did* potentially provide coverage for a specific type of contract (an "insured contract") because, after all, an exception to an exclusion in that policy *said* it did. The *Columbia* court appears completely unaware of what happened in *Fidelity*,[4] and makes no attempt to distinguish or overrule it.

How could this happen? The answer probably lies in *Columbia*'s procedural posture. A group of homeowners sued a company called Arkansas Infrastructure, Inc. ("AI") for breach of contract. *See* 2016 Ark. 185, at *3. The homeowners had hired AI to construct foundation pads in accordance with an engineering firm's designs and specifications, but AI allegedly failed to follow those designs and specifications, resulting in extensive damage to the foundations and structures that were subsequently erected on the pads. *See id.* at *3–*4. AI's insurer under its CGL policy initially provided a defense in that case, but also filed a separate lawsuit in federal court, seeking a determination of whether the policy provided coverage for liability in the underlying lawsuit. *See id.* at *4.

---

[4] The majority opinion and a dissent in *Columbia* each cites *Fidelity* only once in passing, for the unrelated matter of how to define the word "accident." *See Columbia*, 2016 Ark. 185, at *7, *20.

The federal court eventually certified two questions to the Arkansas Supreme Court regarding the policy's exclusions and definition of "occurrence." *See id.* at *2, *5. That certified case was *Columbia*. But then after accepting certification, the Arkansas Supreme Court declined to answer either certified question, holding that they were "moot" because the policy provided no coverage for contract liability. *See id.* at *2. In doing so, the *Columbia* court not only issued a ruling that was inconsistent with the certifying federal court's prior ruling that there was a duty to defend (and therefore at least the possibility of coverage), *see id.* at *13–*14 (Danielson, J., dissenting), but it answered a question it had not been asked, on the basis of an inadequate record. *See id.* at *14 (Danielson, J., dissenting).

This Court is unable to reconcile the reasoning and holdings of *Fidelity* and *Columbia*. The former case explicitly looked to an exception to an exclusion to find the possibility of coverage in a CGL policy for a contractual liability. The latter case explicitly held that CGL policies can never cover contractual liabilities, regardless of what exceptions to exclusions they may contain. This Court can only conclude that if the Arkansas Supreme Court were confronted with the instant issues (on a complete record), it would simply have to explicitly overrule either *Fidelity* or *Columbia*. Since this Court must pick between them, it will accept *Fidelity* and reject *Columbia* for two reasons. One reason is that, *Fidelity*, unlike *Columbia*, was issued on the basis of a complete record and on a question that was properly before it. The other reason is that, *Fidelity*, unlike *Columbia*, is consistent with the following two common-sense and well-established propositions under Arkansas law. First, an insurance policy should be interpreted in a way that gives meaningful effect to *all* of its provisions (including its exclusions and

exceptions). *See, e.g., Johnson v. State Farm Mut. Auto. Ins. Co.*, 2017 Ark. App. 26, at *10, 510 S.W.3d 276 ("Different clauses of an insurance contract must be read together and the contract construed so that all of its parts harmonize."); *Cont'l Cas. Co. v. Davidson*, 250 Ark. 35, 41, 463 S.W.2d 652 ("A construction which neutralizes any provision of a contract should never be adopted if the contract can be construed to give effect to all provisions."). And second, if an insurance policy *says* in an exception to an exclusion that it provides coverage for certain kinds of contracts, then that insurance policy *means* that it provides coverage for certain kinds of contracts. *See, e.g., Unigard*, 331 Ark. at 221 ("The provisions of an insurance contract are to be interpreted by the court in the plain and ordinary meaning of the terms and cannot be construed to contain a different meaning." (internal quotation marks omitted)).

But this does not mean Murphy wins. Indeed, in this Court's view, *Unigard*, *Fidelity*, and the language of the Policy itself all ultimately require ruling that the Policy provides no possibility of coverage for (and therefore no duty to defend against) Valero's claims against Murphy.

In *Unigard*, the insured (which coincidentally happened to be Murphy) leased an island from the Blakely Corporation ("Blakely"), spilled a bunch of petroleum on the island during its lease, and then concealed evidence of the spills without cleaning any of them up when it returned the island to Blakely at the end of its lease. *See* 331 Ark. at 215–17. Blakely sued Murphy for negligence, breach of lease, and trespass. *See id.* at 216–17. The negligence claim was dismissed as outside the statute of limitations, but the other two claims proceeded to a jury which found in Blakely's favor. *See id.* Murphy had several different CGL policies with several different carriers, and as mentioned above,

those policies contained language about "property damage" that was essentially identical to the coverage language in the instant Policy. *See id.* at 219–20. Murphy sought indemnification under those policies for Blakely's judgment. *See id.* Murphy's insurers refused. *See id.* Murphy sued. *See id.*

The *Unigard* court carefully examined the policies' coverage language and the facts that led to Blakely's judgment against Murphy. It concluded that the policies "simply afford no coverage for contract damages," 331 Ark. 211, 224, observing that the liability did not arise from the property damage itself, but rather from Murphy's failure (and fraudulent attempts to conceal its failure) to honor its contractual promise to return the leased premises "in as good state and condition as reasonable usage thereof will permit," *see id.* at 222. The Court acknowledged that "[t]he case would arguably be different . . . had the jury based its award of compensatory damages on the negligence claim originally brought by the Blakely Corporation," but "that claim was dismissed under the statute of limitations and never reached the jury." *Id.* "No doubt there was an 'occurrence' [as defined by the policies] in this case . . ., but Murphy Oil was absolved of liability for it due to the running of the statute of limitations. Surely the insurers cannot be held liable for events for which their insured is not liable." *Id.* at 25. Rather, *Unigard* was analogous to other cases "in which courts have denied coverage under similar language in CGL policies where the insured was held liable in the underlying suit on theories of fraud or misrepresentation." *See id.* at 226.

However, *Unigard* did *not* say that no CGL policy can ever provide coverage for any type of contract claim. And no exclusions or exceptions were at issue in *Unigard*. As already noted above, in the subsequent case of *Fidelity* a CGL policy's exclusions and

13

exceptions *were* at issue; and the *Fidelity* court held that if the underlying liability arose from an "insured contract," then the CGL policy there would cover it pursuant to an "insured contract" exception. *See* 353 Ark. at 842–43. Indeed, the *Fidelity* court explicitly distinguished its case from *Unigard* on those grounds. *See id.* at 843–44. But as already mentioned, Murphy does not contend that its APA with Valero is an "insured contract." And *Fidelity* had nothing to say about the particular type of exception on which Murphy is presently hanging its hat: the aforementioned "absence of the contract" exception.

This Court finds the instant facts strongly analogous to those in *Unigard*. True, the instant case involves a *sale* of land from Murphy to Valero while *Unigard* involved the return of *leased* land from Murphy to Blakely. But the gravamen of the claims on which Blakely prevailed is essentially identical to those which Valero is presently prosecuting: that Murphy provided property to the aggrieved party that was in much worse condition than Murphy falsely represented it to be, and that Murphy breached contractual obligations in doing so. As in *Unigard*, Valero's claims do not arise from the property damage itself, but rather from Murphy's alleged false representations and alleged failure to honor its promise to provide Valero property that met certain agreed-to standards of regulatory compliance and good condition.

The big difference between the instant case and *Unigard* is that the instant Policy contains an exclusion stating that it "does not apply to . . . 'property damage' for which [Murphy] is obligated to pay damages by reason of the assumption of liability in a contract or agreement," *see* Doc. 30-5, p. 22, § I.2(b), and an exception to that exclusion for "liability for damages . . . [t]hat [Murphy] would have in the absence of the contract or agreement," *see id.* at § I.2(b)(1). Per *Fidelity*, these provisions certainly must be taken

14

into account and interpreted in a manner that is consistent with the rest of the Policy. But they do not operate to *expand* coverage beyond what it would have been if there were no exclusions at all; exceptions to exclusions simply "have the effect of restoring coverage that would otherwise have been lost via the exclusion, in much the same way that a double negative is a positive." 17A COUCH ON INSURANCE § 254:13 (3d ed. Dec. 2018 Update).[5] Whatever the Policy means by "liability for damages . . . that [Murphy] would have in the absence of the contract or agreement,"[6] it is not referring to anything that would not have qualified in the first place as liability for "property damage" that "is caused by an 'occurrence.'" And per *Unigard*, the types of claims that Valero is making against Murphy do not so qualify, because they are not premised on property damage; rather, they are premised on damages arising from false representations and from failures to deliver what was bargained for.

At any rate, and even setting *Unigard* aside, the "absence of a contract" exception's language plainly is not describing Valero's claims. To whom would Murphy have been liable for property damage in the absence of the APA? To itself? Certainly not to Valero, since the APA is the vehicle through which Valero obtained the Refinery in the first place.[7] And although Murphy can make a fair argument that the EPA might have

---

[5] For this reason, Murphy is incorrect when it argues, *see* Doc. 40, p. 21, that an endorsement entitled "Alienated Premises Coverage" expanded the scope of coverage under the Policy, *see* Doc. 30-5, p. 57. That endorsement simply added an exception to a different exclusion in the Policy, entitled "Damage to Property." *See id.* at 24, § I.2(j)(2).

[6] For example, this exception might restore coverage for certain negligence claims that were contractually settled. *See, e.g., Ins. Co. of N. Am. v. McCarthy Bros. Co.*, 123 F.Supp.2d 373, 374–75, 377–78 (S.D. Tex. 2000).

[7] During oral argument, counsel for Murphy urged the Court to assume that in the absence of the APA, Valero would still have an interest in the Refinery. It seems to the Court that

15

imposed regulatory penalties on it even in the absence of the APA, this misses the more fundamental point that regulatory penalties are regulatory penalties—not "sums that [Murphy] becomes legally obligated to pay as damages because of . . . 'property damage.'" *See* Doc. 30-5, p. 21, § I.1(a).

Simply put, whether one comes at the matter from *Columbia*, from *Unigard*, or from *Fidelity* and the plain language of the claimed exception, there is no possibility of coverage under the Policy for Valero's claims against Murphy. And the conclusion is the same regardless of whether one considers Valero's claims as formulated in its December 2012 demand letter or as formulated in the complaint initiating its New York Lawsuit. Those documents' gravamen and theories of liability are identical. *Compare* Doc. 30-3 *with* Doc. 30-4. Therefore, Liberty does not owe, and never has owed, Murphy any duty under the Policy to provide a defense against Valero's claims.[8]

---

by this request, Murphy is essentially asking it to assume the absence not of the entire contract, but rather only of the APA's indemnity and limitation-of-liability clauses. But this is inconsistent with the plain language of the exclusion and exception at hand. The Policy excludes coverage for obligations to pay property damages that are incurred "by reason of the assumption of liability in a contract or agreement." *See* Doc. 30-5, p. 22, § I.2(b). It then states that "[t]his exclusion does not apply to liability for damages . . . [t]hat the insured would have in the absence of *the contract or agreement*." *See id.* at § I.2(b)(1) (emphasis added). It does *not* use the language of "in the absence of *the assumption of liability*." The APA's indemnity and limitation-of-liability clauses were not a separate contract from the APA; they, like the Refinery itself and the purchase price that was paid to Murphy for it, were simply part of the consideration that was exchanged by Murphy and Valero under the APA. Adopting Murphy's interpretation, then, would require construing the Policy inconsistently with its "plain and ordinary meaning," in contravention of Arkansas law. *See Horn*, 5 Ark. App. at 278–79.

[8] Given this ruling, the Court sees no need to reach the question, disputed by the parties, of whether pre-litigation negotiations may ever qualify as a "suit" that triggers a duty to defend under the Policy. *See* Doc. 30-5, p. 21, § I.1(a). Likewise, there is no need to reach the question of whether a hypothetical duty to defend would have been subject to the Policy's deductible or policy limits.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff Murphy Oil Corporation's Motion for Partial Summary Judgment (Doc. 28) is **DENIED**, and Defendant Liberty Mutual Fire Insurance Company's Cross-Motion for Summary Judgment (Doc. 35) is **GRANTED**. Murphy's Complaint (Doc. 1) is **DISMISSED WITH PREJUDICE**. Judgment will enter contemporaneously with this Order.

**IT IS SO ORDERED** on this 8th day of January, 2019.

/s/ Timothy L. Brooks
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE